UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER PAN BUS LINES, INC.,
    *Plaintiff,*

v.

GREYHOUND LINES, INC.,
    *Defendant*

**VERIFIED COMPLAINT
AND DEMAND FOR JURY TRIAL**

## PARTIES

1. The Plaintiff, Peter Pan Bus Lines, Inc. ("Peter Pan"), is a privately-owned Massachusetts corporation that operates an intercity bus company with a principal place of business located at 1776 Main Street, Springfield, Hampden County, Massachusetts.

2. The Defendant, Greyhound Lines, Inc. ("Greyhound"), is a privately-owned Delaware corporation that operates an intercity bus company with a principal place of business located at 350 N. St. Paul Street, Dallas, Texas. Upon information and belief, Greyhound is a wholly-owned subsidiary of FirstGroup plc, a publicly-traded company located in the United Kingdom.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. This action also seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201(a), for the purpose of determining a question of actual controversy between the parties.

1

5.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).  Peter Pan is a resident of this district and a substantial part of the events giving rise to the claim occurred in Massachusetts.

## BACKGROUND

### Pool Formation

6.  In the mid-1990s, in response to a price war between Peter Pan and Greyhound, the parties began negotiating a Pooling arrangement on certain routes in the northeast, pursuant to 49 U.S.C. § 14302. The three (3) resulting Revenue Pooling Agreements ("RPAs") provide for pooled bus service by Peter Pan and Greyhound between:

    (1) New York and Philadelphia, per agreement dated January 17, 1997, which was approved by the Surface Transportation Board in STB Decision No. MC-F-20904 (served June 30, 1997);

    (2) New York and Boston, per agreement dated September 17, 1997, which was approved by the Surface Transportation Board in STB Decision No. MC-F-20912 (served February 12, 1998); and

    (3) New York and Washington, D.C., per agreement dated May 16, 1997, which was approved by the Surface Transportation Board in STB Decision No. MC-F-20908 (served April 29, 1998).

7.  The RPAs were subsequently amended on four subsequent occasions by the parties.

8.  While the RPAs created a complex system for joint management and operation of the parties' businesses in the northeast region, essentially the system obligates Greyhound to operate the terminals in the region (with 4 exceptions) and to assume responsibility for

2

the costs relating to the sale of tickets, the operation of bus terminals, and the accounting

for the Pool. In exchange, Greyhound is compensated by way of an adjustable percentage

of Pool sales (the "IVSE", as discussed in more detail below) and a significant

administrative fee paid by Peter Pan.

9. Because of the 30-year term of the RPAs, the parties spent significant time and energy

negotiating the agreements and Peter Pan has based nearly all subsequent business

decisions in the region on the continued assumption and reliance that the Pool will

continue in operation for at least the entire period originally contemplated in the RPAs.

10. While Peter L. Picknelly and Brian Stefano, the current President and CEO of Peter Pan,

respectively, were involved in the negotiation of the RPAs, no current member of

Greyhound's management was involved in the negotiations in any substantive way.

11. The "Internal Variable Station Expense" ("IVSE"), or "cost to sell," discussed in ¶ 8

above, was negotiated and designed to help offset some of Greyhound's costs to sell,

including ticket sales commissions to agents and other third-party vendors, as well as the

operation of the physical terminals in those places where Greyhound maintained the

terminals. For most of the relationship between the parties, the parties referred to the

IVSE as the "cost to sell" or used similar terminology.

12. The IVSE was never designed to fully compensate Greyhound for its cost to sell or the

costs of operating the terminals, and any increase to the rate was explicitly capped at

three (3%) percent by the RPAs, regardless of the actual expenses incurred by

Greyhound. **RPAs, ¶ 7(b)**.

13. In addition, Greyhound negotiated an additional 3.43% administrative fee, ostensibly to cover the back office accounting and other support that it would provide to the Pool in terms of the revenue accounting and distribution. **RPAs, Attachment 5.** Since 2008, Peter Pan paid nearly $6 million to Greyhound in administrative fees.

14. Following the implementation of the Pool, the parties negotiated and implemented numerous agreements that affected the day-to-day operation of the Pool. While four of these agreements have required approval from the STB as formal amendments to the RPAs, others have simply involved formalization or modification of the administrative, structural and financial components of joint operation of the Pooled routes.

15. Based on the explicit language of the RPAs, the amendments, and the parties' course of conduct since the inception of the Pool, the parties operate jointly in the northeast and, among other things, work cooperatively to: establish intermediate stations within the Pool,[1] review operations, scheduling, conditions, terminals and customer service within the Pool,[2] discuss any changes in service in the Pool,[3] share costs within the Pool,[4] share Pool revenue,[5] and jointly coordinate and fund marketing efforts within the Pool.[6]

16. Similarly, while Greyhound performs accounting for the Pool in exchange for the payment of the administrative fee, Peter Pan is entitled to access to Greyhound's

---

[1] RPAs, ¶ 3(b).
[2] RPAs, ¶ 4(a).
[3] RPAs, ¶ 4(a).
[4] RPAs, ¶¶ 2(b), 5, 6 and 7(c); First Amendment to the RPAs, ¶ (e)(a)
[5] RPAs, ¶ 8.
[6] First Amendment to the RPAs, ¶ (j).

4

accounting records[7] and is entitled to comprehensive monthly settlement statements from Greyhound.[8]

### Telephone Sales

17. Peter Pan has been selling Pool tickets from its call center since 2004. When Peter Pan first considered selling Pool tickets from its call center, Kathy Giard, Peter Pan's Senior Director of Revenue, discussed with Greg Alexander, Greyhound's then-Vice President, the possibility of using Greyhound's TRIPS computer system to process and issue such tickets.

18. Mr. Alexander informed Ms. Giard that Peter Pan would not be able to use TRIPS in this capacity due to certain technical issues with the system. Nonetheless, since Greyhound was unable to change the programming, Mr. Alexander agreed that Peter Pan should issue Pool tickets from its call center on Peter Pan paper – which Peter Pan immediately began to do.

19. For each such ticket sold through the Peter Pan call center, tickets were issued on Peter Pan branded paper. When the ticket was used on a Greyhound or Peter Pan bus in the Pool, it would be included in the "lift" by the bus driver and placed in the Pool envelope for processing and payment. The tickets were not only printed on Peter Pan paper (which distinguished it from regular Pool tickets printed on Greyhound or Pool paper), but they were identified on their face as tickets originating in Peter Pan's call center.

20. Pursuant to the agreement between the parties, these tickets would then be collected by Greyhound and submitted to Peter Pan through the Interline clearing house for

---

[7] RPAs, ¶ 8(d).
[8] RPAs, ¶ 8(e).

reimbursement, a nationwide clearinghouse for the reimbursement of bus lines for a wide variety of expenses, including providing service for a passenger using another carrier's ticket.

21. Specifically, Greyhound would send Peter Pan copies of all tickets and a bill for 80% of the ticket price to allow Peter Pan to retain its 20% commission. These funds were then paid to Greyhound through the clearinghouse.

22. By virtue of this process, Greyhound was immediately and intimately aware of the call center tickets and specifically sought reimbursement from the Interline clearing house for the ticket price less the 20% commission owed to Peter Pan over a period of several years. Greyhound would have been made aware of the commission on the Peter Pan call center ticket every single time a driver envelope was processed.

## Agent Commissions

23. Pursuant to the RPAs, Peter Pan acts as a ticketing agent in the four terminals it currently operates within the Pool (Springfield, Harford, Worcester, and Framingham) and, like all other ticket agents, Peter Pan receives a sales commission for tickets sold at those terminals.

24. If a customer walks into a Peter Pan-operated terminal and purchases a ticket on a Pool route, Peter Pan receives a commission for that sale, with the commissions being separately negotiated for each location in the form of Bus Terminal License agreements. This has been true since the inception of the Pool.

25. Similar commissions are also used for other agents, including online agents like Gotobus. Gotobus is a website operated by a third party that offers bus tickets from numerous

6

carriers around the country, including Pool routes operated by Greyhound and Peter Pan. For every ticket sold on a Pool route by Gotobus, Gotobus receives a commission – which Greyhound pays as part of its "cost to sell."

**Web Sales**

26. As the internet emerged as a selling outlet in the mid-2000s, Peter Pan invested in technology and began successfully selling print at home tickets for its non-Pool routes from its website.

27. Peter Pan immediately noticed the popularity of the internet as a sales medium to its customers. Using technology that Peter Pan developed at its own expense, customers could purchase tickets from Peter Pan's website, print their tickets at home, and use that ticket to board the bus directly upon reaching the bus terminal.

28. The true potential of online ticket sales became apparent with the introduction of BoltBus into the Pool. BoltBus, a joint venture/partnership between the parties, is a curbside bus company that offers tickets for sale online. BoltBus became an essential part of the partnership between the two entities and is incorporated into the Pool via the Fourth Amendment to the RPAs in June 2008.

29. Following the success of BoltBus and Peter Pan's own online sale of non-Pool tickets from its website, Peter Pan wanted to offer tickets on Pooled routes for sale on Peter Pan's website.

30. In an effort to ensure that Peter Pan would be compensated for tickets sold on its website as it was for ticket sales at its terminals and call center, Peter Picknelly proposed to Dave Leach, Greyhound's President and CEO, that a sales commission payable to Peter Pan be

7

implemented for all future online Pool ticket sales made by Peter Pan from its website for the Pool at a rate equal to the IVSE rate during a meeting in Springfield, Massachusetts in June 2008. Mr. Leach gladly agreed to do so and memorialized this agreement in his notes from the meeting.

31. Greyhound began paying the commission to Peter Pan for web sales as soon as Peter Pan began selling Pool tickets on its website on September 11, 2008 and paid a commission for all such sales until Greyhound unilaterally stopped in 2013.

**Change of Itinerary Fees**

32. Change of itinerary fees (sometimes referred to as "change fees" or "COIF") are fees charged by Greyhound to customers who wish to transfer their ticket to another time or route.

33. Greyhound has the ability to track and calculate the number and amount of change of itinerary fees collected for each specific route that it operates, even providing a detailed report calculating the specific individual tickets for which a change of itinerary fee was charged.

34. Under the RPA, Gross Pool Revenue is defined to include "the gross amounts received by Peter Pan and Greyhound for the sale of tickets and the issuance of busbills…" **RPAs, ¶ 1(b).**

35. In the 2008 meeting between Peter Picknelly and Dave Leach, Greyhound acknowledged its obligation to share change fees and explicitly agreed "to implement shared change fees within the Pool," as memorialized in Mr. Leach's notes from the meeting.

36. Greyhound has breached this agreement, and the RPAs, by refusing to treat the revenue generated from change fees as Gross Pool Revenue and has continually withheld Peter Pan's share of such revenue.

**Unredeemed Tickets**

37. As set forth above, the RPAs define Gross Pool Revenue (that revenue which is subject to division between Peter Pan and Greyhound pursuant to a fixed percentage) as all revenue from the sale of bus tickets (regardless of whether the tickets are used or not).  **RPAs, ¶ 1(b)** ("The revenues which shall be the subject of this Agreement ('Gross Pool Revenue') are the gross amounts received by Peter Pan and Greyhound from the sale of tickets and the issuance of busbills, regardless of where or by whom sold or issued, for the transportation of passengers and express in scheduled, intercity bus service over all or any portion of the Pooled Routes.").

38. Unredeemed ticket income is revenue generated from tickets that are purchased but never used by a customer or refunded.

39. Greyhound has never treated revenue generated by unredeemed tickets as Pool revenue, despite the clear language of the RPAs, and Peter Pan has never received any portion of such revenue.

40. In October 1998 – just eight (8) months after the final RPA was approved by the STB – the Parties amended the RPAs to include a statement that "the parties agree that they will study the extent and value of unredeemed tickets sold for transportation over the Pooled Routes, and, if after such study they agree that the value of such tickets is material, revenue from such tickets shall be divided among the parties according to the percentages of subparagraph d of Section 3."  **First Amendment to the RPAs, Section (e)**.

41. Despite agreeing to do so in the First Amendment to the RPAs in 1998, Greyhound did not conduct its first study to investigate the impact of unredeemed tickets in the Pool until 2007.

42. The 2007 study, which used sales data from February of 2004, 2005 and 2006, found that, over the course of the study period, the number of unredeemed tickets had increased from .9% of sales in 2004 to 2.0% of sales in 2006.

43. Greyhound again agreed in the 2008 meeting between Dave Leach and Peter Picknelly to make a more concerted effort to accurately determine the value of unredeemed tickets and treat it as gross Pool revenue.

44. The parties later agreed that the emergence of the internet as a sales channel resulted in an increase in unredeemed tickets in the Pool.

45. This resulted in a subsequent study, based on sales data from February 2010.  At least one of the methods employed by Greyhound in the 2010 study found unredeemed tickets to equal 2.8% of total Pool sales.

46. Despite its obligation to do so in the MOU and the RPAs, Greyhound never approached Peter Pan regarding any study of the parties' cost to sell in an effort to review such costs in connection with Greyhound's obligation to treat unredeemed ticket revenue as Gross Pool Revenue, despite Peter Pan's stated interest and willingness to do so.

47. Greyhound continues to refuse to treat revenue from unredeemed tickets as Gross Pool Revenue subject to division and distribution to Peter Pan.

602946.1

**Memorandum of Understanding**

48. In May 2011, having paid Peter Pan a commission for all Pool ticket sales on its website since 2008, the parties executed a Memorandum of Understanding ("MOU"). The MOU was designed to resolve several outstanding issues between the parties relating to the operation of the Pool and the implementation of Express service on Pooled routes, including the implementation and use of capacity management within the pool.

49.  Historically, bus companies sold as many tickets as they could for a route and supplied buses as needed to ensure people departed at the desired time.  On occasion, this meant that customers may have to wait for a subsequent bus, but typically a bus company would simply arrange for another bus to leave at the same time with any "overflow" passengers.

50. In 2011, however, Greyhound began pushing for "capacity management" on all of its routes.  Under this system, each seat on a bus was available for sale – much like seats on an airplane. When the bus sold out, customers were directed to another bus – either at the same time or on a later-scheduled route.

51. Greyhound believed that this system would be more efficient by eliminating the need to scramble for buses at the last minute to accommodate overflow passengers.  Moreover, since Greyhound had recently begun to reduce the number of buses it was operating nationwide, it was eager to switch to a capacity managed system which would more-easily facilitate reduction of its fleet, if necessary.

52. At the time the MOU was executed, Greyhound had been paying a commission to Peter Pan for web sales for nearly three years.

53. At some point prior to the execution of the MOU, senior management at Greyhound, including its CEO, Dave Leach, and others, became aware that some Greyhound staff believed that the web commission paid to Peter Pan had been improperly calculated and/or was fundamentally inappropriate.

54. While there is absolutely no basis in fact for Greyhound's claim that the web commission was improperly calculated, senior Greyhound management, including Mr. Leach, discussed the issue prior to the execution of the MOU and opted to waive the potential claim in order to implement managed capacity and the rollout of Express.

55. There was no obligation under the RPAs for Peter Pan to move to capacity management. Indeed, Peter Pan was already enjoying the benefits of its June 2008 agreement with respect to web commissions and had no reason to switch to a different system. Above all else, Peter Pan wanted to ensure that it continued to receive its rightful sales commissions.

56. In order for Greyhound to run capacity management on the Pooled routes, it would need Peter Pan's website to communicate in real time with Greyhound's website so Greyhound would know exactly which seats had been sold at any given moment and, as a result, which seats were still available.

57. Unfortunately, due to limitations with Greyhound's software system (TRIPS), it was unable to communicate with Peter Pan's website and ticketing software. As a result, Greyhound needed Peter Pan to convert its website to operate on the Greyhound software system – a process that Greyhound assured Peter Pan could be completed in a matter of months. During the interim period, however, Greyhound proposed that Peter Pan customers would be redirected to Greyhound's website.

58. Peter Pan had two major concerns with redirecting its online customers to the Greyhound website to consummate ticket purchases.

59. First, Peter Pan was concerned that since redirected customers would end up purchasing from Greyhound's website – rather than Peter Pan's –Peter Pan would be prevented from collecting any web sales commissions. Peter Pan would have originated the customer and generated the sale, but the sale would be consummated on Greyhound's site. Moreover, Greyhound claimed it was unable to track the sales that would have been made by Peter Pan if not for Greyhound's technological shortcomings. Peter Pan, quite reasonably, wanted to be compensated for the commissions it would have earned but for its agreement to accommodate Greyhound and consummate all sales on Greyhound's website.

60. To rectify this concern, the parties agreed that, while Peter Pan was switching over to Greyhound's TRIPS system, Greyhound would continue to pay Peter Pan a commission on web sales at a fixed rate of 12.7948%. Since the amount of web sales for each website would not be known by the TRIPS system until the computer systems were updated, the parties agreed that the commission rate would be paid assuming that the division of web sales remained consistent with a study of the prior 6 months of web sales in the Pool.

61. The parties understood that, upon conversion of the Peter Pan computer system (or after one year), the commission would be based on the actual volume of sales completed on each party's web site. Until the conversion, however, there was no way to determine the actual number of sales originated by Peter Pan and, as a result, the estimated sales split would need to be employed for determining the commission amount.

13

62. Greyhound began making web commission payments under the MOU to Peter Pan in June 2011 and continued to make payment of the web commission to Peter Pan until February 2013.

**Customer Email Addresses**

63. The other major negative impact resulting from the redirection of Peter Pan customers to Greyhound's website was the fact that such a move would undermine Peter Pan's brand and customer loyalty.

64. Under Greyhound's proposal at the time, Peter Pan would be discouraging its own customers from using the Peter Pan website.  As more time passed, Peter Pan was concerned that its customers would become accustomed to using Greyhound's website and would be more likely to access Greyhound's website in the first instance, irreparably damaging Peter Pan's customer reputation and brand loyalty.

65. In addition, redirecting customers to Greyhound for Pooled routes makes it impossible for customers to purchase on Peter Pan's website tickets for connecting schedules.  This causes confusion and frustration for Peter Pan's customers, which further undermines Peter Pan's customer loyalty and drives customers to use Greyhound's competing website.

66. To address Peter Pan's concerns, it was essential to limit the time period when customers would be redirected by Peter Pan to Greyhound's website.  Before entering into the MOU, Greyhound repeatedly assured Peter Pan that the necessary upgrades would be accomplished in a very short timeframe.  Once the upgrade was made, customers would

14

be able to purchase tickets on Peter Pan's website, but Greyhound would know the number of tickets sold for a particular trip and could limit sales to the available capacity.

67. The successful implementation of the interface was necessary for Peter Pan to know how many Pool sales were generated from its website for an accurate determination of its web commissions.

68. Greyhound assured Peter Pan that Greyhound could make the necessary upgrades quickly, in a matter of months, but certainly in less than one year. It was based on this assurance that the parties limited the assumed-sales split to be employed for the calculation of commissions to one year. More importantly, the parties knew – and common sense dictates – that the web commission could not be determined in the absence of actual sales data without the use of an estimated sales split like the parties employed through the MOU.

69. Greyhound's one-year guarantee was a critical assurance to Peter Pan that the period of erosion of Peter Pan's brand loyalty and reputation in the eyes of its customers, as caused by the TRIPS website incompatibility, would be limited.

70. Moreover, and of critical importance to Peter Pan, Greyhound agreed to collect and provide Peter Pan with the email addresses for all customers who purchased tickets for the Pooled routes on the Greyhound website. **MOU, ¶ 3** ("Greyhound will prioritize the capture of emails on its website and share emails for customers who bought Pool tickets.").

71. The email contact information of its customers was of crucial importance to Peter Pan, and became even more important during the down period when sales were being

602946.1

completed on the Greyhound website, since it would allow Peter Pan to continue to communicate and remain in contact with its customers and explain the reason for the redirection.

72. On information and belief, Greyhound, through its IT department or third-party vendors, has the ability to access email addresses for customers who purchased tickets on the Greyhound website.

73. Despite Greyhound's explicit promise to "prioritize the capture of emails" and share them with Peter Pan, Greyhound refused to provide these crucial contacts to Peter Pan and has continued to refuse to do so.

## Express Service

74. As part of the capacity managed system imposed by Greyhound, the parties began a new type of bus service called "Express Service" in 2011.

75. Express Service provided a higher level of service and included guaranteed seating, separate boarding, and private waiting areas.  The Express Service drivers wore different uniforms and operated newer buses with enhanced features. Dedicated customer service representatives were proposed who would provide concierge-level service to Express Service passengers.

76. While Express Service was governed by several documents and agreements between the parties, the parties agreed most recently in the MOU that these employees were "expected to be dedicated to the Greyhound Express service and their responsibilities should be 100% dedicated to Greyhound Express."  **MOU, ¶ 7.**

77. While the parties agreed that "on occasion [Express staff] may be asked to help out elsewhere," this was only permissible in rare instances and following approval of management. **MOU, ¶ 7.** Based entirely on these assurances, Peter Pan agreed to share the staffing costs of Express Staff – even in terminals operated by Greyhound alone.

78. Moreover, at the time that the MOU was executed, the only other Express service in operation nationwide was based in Chicago and did not overlap with any Pool terminals.

79. As a result, there was no chance at that time for Express employees to work on non-Pool Express service. It was for this reason that Peter Pan was willing to share in some of these Express staff expenses in Greyhound-operated terminals – despite the fact that such staffing costs were designed to be borne entirely by Greyhound at the terminals it operates in the Pool pursuant to the RPAs.

80. More recently, however, in conjunction with its overall efforts to reduce cost, Greyhound has significantly reduced its own customer service representatives at its bus terminals.

81. While Greyhound has refused to provide relevant records or documentation on this issue, observations from Peter Pan staff in these terminals suggests that, rather than being "100% dedicated to Greyhound Express," Greyhound Express Service employees perform only roughly half of their duties for Pool Express routes, while the other half is spent on Greyhound non-Pool functions.

82. Indeed, in many instances, Express employees are used by Greyhound for non-Pool services not "on occasion," but as an essential component of Greyhound's staffing at its terminals.

83. For example, in the New York Port Authority terminal, Greyhound non-Pool customer service employees are only able to take lunch and other mandated breaks due to coverage of the information booth by Express staff.  Additionally, Express staff will regularly leave Pool Express work uncompleted if non-Pool Express work becomes necessary.

84. The ultimate result of Greyhound's reassignment of its Express and non-Express staff has been that Peter Pan is now responsible for subsidizing a significant portion of Greyhound's regular staffing expenses in many stations.

## Failed Efforts to Implement Web Services

85. Formal work on the implementation of Web Services by Peter Pan began with meetings on or about November 3 and 4, 2011 at Greyhound's offices in Dallas, Texas.

86. Almost immediately, efforts at upgrading the TRIPS system and converting Peter Pan to the system began experiencing significant problems. Despite the fact that Peter Pan prioritized the transition internally, and the near-constant communication between Greyhound and Peter Pan technical staff in working to identify and resolve issues, delays continued to mount and numerous attempts at implementation were wildly unsuccessful, resulting in significant service interruptions (i.e., lost sales opportunities) and repeated instances of failures in the transition necessitating a return to the prior system.

87. On or about April 3, 2012, the parties executed a Web Services Agreement that provided more detail regarding the services to be provided by Greyhound and the commissions to be paid to Peter Pan.

88. In keeping with the structure implemented through the 2008 agreement and the MOU, the Web Services Agreement provided that, once Peter Pan was able to sell tickets through

TRIPS via Greyhound's software, Greyhound would pay Peter Pan a commission on the resulting web sales, less expenses owed by Peter Pan to Greyhound.  **Web Services Agreement, ¶ 6 and Exhibit C thereto.**

89. The commission rate set out in Exhibit C to the Web Services Agreement was approximately 12.7% - exactly the same as the existing IVSE rate at the time the Web Services Agreement was negotiated.  **Web Services Agreement, Exhibit C thereto.**

90. The Web Services Agreement provides that the 12.7% rate "shall only be applicable for the first six months of the Initial Term of this Agreement commencing on the Effective Date. The Parties agree to negotiate in good faith the commissions to be paid [to Peter Pan] for the remainder of the Initial Term." **Web Services Agreement, ¶ 6.**

91. Despite an original planned launch of April 2012, the new web site (with the Greyhound-compatible software system) was finally launched for the first time on June 19, 2012.

92. It was immediately apparent that it was not operating properly and, after a conference call between Peter Pan and Greyhound, it was determined that Peter Pan would have to roll back to its old web site.  This decision was made after operation for only seven (7) hours.

93. After significant efforts to identify and resolve the issues with the website, the web site was launched for a second time on the morning of July 10, 2012. By late morning, the Peter Pan customer service center was again getting calls from customers complaining that they could not access schedules on the Peter Pan web site. The parties were again forced to abort the transition and roll back to the old system.

94. Once again, the parties attempted to launch the web site on July 24, 2012.  By July 26, Peter Pan's information center reported that people could not open the schedules and

fares web page.  Performance was terrible and tests indicated that Greyhound's system was not responding to Peter Pan's requests in a timely fashion.  Once again, Peter Pan was forced to return to its old website on July 26, 2012.

95. After months of further delays, technical difficulties, and failed attempts, Web Services went live again on February 13, 2013. It operated, with significant difficulty and customer complaints, until the parties decided to revert back to the old system on March 22, 2013 due to the service issues.

96. During this six week period, Greyhound paid Peter Pan its commission at the rate provided under the Web Services Agreement (and the MOU).

97. In response to various problems that continued to arise due to Greyhound's inability to convert Peter Pan's website to a TRIPS-compatible system, Peter Pan began investigating the possibility of switching to a third-party vendor for processing sales.

98. Specifically, Peter Pan began inquiring of Greyhound whether it would permit Peter Pan to utilize Transcor to process its own internet sales. Transcor is a company that is closely related to Greyhound that processes online transactions for Greyhound and other parties and is experienced in processing TRIPS transactions.

99. Eventually, Greyhound employees and Terry Cordell from Transcor met with Peter Pan employees on April 18, 2013 in Springfield to present various options moving forward.

100.    Greyhound personnel, with the assistance of Mr. Cordell, gave an in-depth presentation regarding the differences between switching to Transcor compared with continuing under the Web Services Agreement with Greyhound.

101.     Greyhound's presentation specifically stated that Peter Pan would continue to receive a commission under Web Services, while it would not receive a commission for web sales if Peter Pan switched to Transcor.

102.     Based on this information, and the ongoing promise of web commissions, Peter Pan elected not to leave Web Services for Transcor following the April 2013 meeting.

103.     In February 2013, Greyhound unilaterally stopped paying web commissions to Peter Pan under the Web Services Agreement. This only became known to Peter Pan when the February Pool settlement statements were produced by Greyhound after the April 2013 meeting in Springfield with Greyhound and Transcor.

104.     Following Greyhound's unilateral termination of payments of the web commission under the Web Services Agreement, Greyhound further refused to negotiate in good faith regarding a web commission rate going forward, as required by the parties' agreement.

105.     On October 30, 2013, the parties re-launched Web Services. The same issues occurred regarding service interruption and customer complaints spiked.

106.     On June 18, 2014, the parties agreed to terminate the Web Services Agreement, reserving their respective rights to pursue claims thereunder.

**Partnership**

107.     Throughout the course of the parties' dispute, Greyhound has repeatedly contended that the Pool, including BoltBus, is not a partnership, despite the fact that the relationship between the parties in respect to the Pool and BoltBus exhibit all of the necessary characteristics of a partnership under both Massachusetts and Texas law.

108.     Greyhound's refusal to treat the Pool and BoltBus as a partnership has inhibited

Peter Pan's ability to participate in management of both the Pool and BoltBus and has

significant impact on the dissolution of the parties' relationship in the event Greyhound

seeks to terminate the Pool.

**Prerequisite to Suit**

109.     Peter Pan has satisfied all conditions precedent to the filing of this action pursuant

to the governing agreements and is entitled to pursue the claims herein under the RPAs.

**RPAs, ¶ 23.**

## COUNT I
### (Breach of Contract)

110.     Peter Pan restates and realleges the allegations contained in paragraphs 1 through

109 of this Complaint as though fully restated herein.

111.     Greyhound's conduct, as described herein, constitutes a breach of the RPAs, the

MOU and the related agreements between the parties.

112.     Peter Pan has satisfied all of its obligations under said agreements.

113.     As a result of Greyhound's breach of contract, Peter Pan has sustained, and

continues to sustain, significant damages.

## COUNT II
### (Promissory Estoppel)

114.     Peter Pan restates and realleges the allegations contained in paragraphs 1 through

113 of this Complaint as though fully restated herein.

115.     Peter Pan relied upon the explicit and implicit promises, both written and

unwritten, of Greyhound that Peter Pan would (1) receive a sales commission for the sale

of Pool tickets on its website and the IVSE rate, (2) receive its proper share fo revenue

generated from the collection of change fees within the Pool; (3) receive its proper share

of revenue generated from the sale of unredeemed tickets in the Pool; (4) receive email

addresses from Pool customers as set forth herein; and (5) only be charged for Express

staff costs for staff that was solely responsible for work on Pool routes.

116.     In reliance upon Greyhound's promises set forth herein, Peter Pan took

affirmative acts to its detriment as detailed in this Complaint.

117.     As a direct result of Greyhound's breach of its promises, Peter Pan has suffered

direct and consequential damages.

## COUNT III

### (Declaratory Judgment)

118.     Peter Pan restates and realleges the allegations contained in paragraphs 1 through

117 of this Complaint as though fully restated herein.

119.     An actual controversy presently exists between Peter Pan and Greyhound

regarding the governing terms of the parties' agreements relating to the operation of the

Pool.

120.     The controversy is of sufficient immediacy and magnitude to justify the issuance

of a declaratory judgment.

121.     The issuance of declaratory relief by this Court will terminate some or all of the

existing controversy between the parties.

122.     Peter Pan requests that this Court enter a declaration:

(a)     that Peter Pan is entitled to a reasonable web commission for the sale of Pool tickets consummated on its website with respect to tickets already sold, as well as those tickets sold in the future;

(b)     that Greyhound is obligated to treat the revenue generated from the collection of change of itinerary fees as Gross Pool Revenue under the RPAs and that Peter Pan is entitled to its share of such revenue;

(c)     that Greyhound is obligated to treat the revenue generated from the sale of unredeemed tickets as Gross Pool Revenue under the RPAs and that Peter Pan is entitled to its share of such revenue;

(d)     that Peter Pan is not obligated to share in the expense of Express Service staffing at any station operated by Greyhound within the Pool;

(e)     that Greyhound is obligated to provide Peter Pan with the email addresses for any customer who purchased a Pool ticket on the Greyhound website during the period of time when such Pool customers were redirected to the Greyhound website from the Peter Pan website to consummate such sales;

(f)     that the Pool, as well as BoltBus, is a partnership and Peter Pan is entitled to the benefits and obligations associated therewith; and

(g)     that Greyhound is not entitled to termination of the Pool.

602946.1

WHEREFORE, Peter Pan respectfully requests that this Court grant the following relief:

1. enter a declaratory judgment granting the relief set forth in Count III of this Complaint;

2. enter judgment against Greyhound in an amount to be determined at trial, plus interest, costs, and attorneys' fees, where appropriate; and

3. such other relief as this Court deems just and appropriate.

## **VERIFICATION**

I, Brian Stefano, state that I have read the foregoing Verified Complaint and the facts set forth therein are true except for those stated upon information and belief and as to those I believe them to be true.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this _____ day of August 2014.

_____
Brian Stefano, President
Peter Pan Bus Lines, Inc.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF,
PETER PAN BUS LINES, INC.,
By its attorneys,


*/s/ Michael K. Callan*
Michael K. Callan, Esq. (BBO #558912)
Jesse W. Belcher-Timme, Esq. (BBO #660343)
Doherty, Wallace, Pillsbury & Murphy, P.C.
One Monarch Place, Suite 1900
Springfield, MA 01144-1900
Tel.: (413) 733-3111
Fax: (413) 734-3910
mcallan@dwpm.com
jtimme@dwpm.com

602946.1