UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PETER PAN BUS LINES, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-30167-MGM |
| GREYHOUND LINES, INC., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S PARTIAL MOTION TO DISMISS
(Dkt. No. 12)

May 17, 2016

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

Plaintiff Peter Pan Bus Lines, Inc. ("Peter Pan") brings this action against Defendant

Greyhound Lines, Inc. ("Greyhound"), asserting claims for breach of contract (Count I) and

promissory estoppel (Count II), and seeking a declaratory judgment (Count III). This dispute arises

out of the parties' agreements regarding the pooling of bus services and revenue. Greyhound has

filed a partial motion to dismiss in which it attacks Peter Pan's claims that Greyhound owes past and

future commissions for bus tickets sold on Peter Pan's website.[1] For the reasons discussed below,

the court will grant Greyhound's motion in part and deny it in part.


## II.    BACKGROUND

The following facts come directly from Peter Pan's complaint and documents referenced

therein. *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir. 2008) ("When . . . a

---

[1] As clarified at the hearing, these web commission claims are contained in all three counts of the complaint. The complaint also asserts additional claims subsumed within one or more counts which are not targeted by Greyhound's motion.

complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998))); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) ("[C]ourts have made narrow exceptions [to the general rule that materials outside of the complaint may not be considered] for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claims; or for documents sufficiently referred to in the complaint.").[2]

Peter Pan is a privately-owned Massachusetts corporation with a principal place of business in Springfield, Massachusetts. (Dkt. No. 1, Compl. ¶ 1.) Greyhound is a privately-owned Delaware corporation with a principal place of business in Dallas, Texas. (*Id.* ¶ 2.)[3] In the mid-1990s, in response to a "price war" between the parties, they began negotiating a pooling arrangement on certain routes in the northeast pursuant to 49 U.S.C. § 14302. (*Id.* ¶ 6.) The parties entered into three written Revenue Pooling Agreements ("RPAs") in 1997, all approved by the Surface Transportation Board, which provide for pooled bus service between (1) New York and Philadelphia, (2) New York and Boston, and (3) New York and Washington, D.C. (*Id.*) In essence, the RPAs assign each party a percentage of miles to operate in the Pool and allocate to each a percentage of ticket revenues from those operations. (Dkt. No. 13, Exs. 2, 3, 4, at ¶¶ 3(d) and 8.) The RPAs also require Greyhound to operate terminals in the region (with four exceptions) and to assume responsibility for the costs relating to the sale of tickets, the operation of the bus terminals, and the accounting work for the Pool. (Compl. ¶ 8.) In exchange, Greyhound is compensated through an adjustable percentage of

---

[2] The parties attached many of the same exhibits to their briefing, namely, the written contracts at issue here. Although these exhibits were not attached to the complaint, the documents are referenced in the complaint and are central to Peter Pan's claims; moreover, neither party has challenged the authenticity of the documents or even argued the court should not consider these documents.

[3] Accordingly, Peter Pan's complaint invokes diversity jurisdiction under 28 U.S.C. § 1332.

pool sales, the "Internal Variable Station Expense" ("IVSE"), as well as an administrate fee paid by Peter Pan. (*Id.*) The IVSE was "designed to help offset some of Greyhound's costs to sell, including ticket sales commissions to agents and other third-party vendors, as well as the operation of the physical terminals in those places where Greyhound maintained terminals." (*Id.* ¶ 11.) The RPAs provide for a 30-year term, and Peter Pan "has based nearly all subsequent business decisions in the region on the continued assumption and reliance that the Pool will continue in operation for at least" that period of time. (*Id.* ¶ 9.) All three RPAs contain choice-of-law provisions, which state: "This Agreement shall be construed and enforced in accordance with the laws of Texas." (Dkt. No. 13, Ex. 2 ¶ 24; Ex. 3, ¶ 26; Ex. 4, ¶ 26.)

In the mid-2000s, Peter Pan began selling print-at-home tickets for its non-Pool routes from its website. (*Id.* ¶ 26.) In light of the success of this selling option, Peter Pan wanted to offer tickets on pooled routes for sale on its website as well. (*Id.* ¶ 29.) Peter Pan wanted to ensure it would be compensated for tickets sold on its website in the same manner it was for tickets sold at its terminals and call centers. (*Id.* ¶ 30.) Accordingly, Peter Picknelly, Peter Pan's Chairman and CEO, proposed to Dave Leach, Greyhound's President and CEO, at a meeting in Springfield in June of 2008 that a sales commission payable to Peter Pan be implemented for all future online Pool ticket sales from its website. (*Id.*) He proposed a commission rate equal to the IVSE rate, and "Mr. Leach gladly agreed to do so and memorialized this agreement in his notes from the meeting."[4] (*Id.*) In particular, handwritten "Notes for PPBL/GLI Meeting June 23/24, 2008," attached to Peter Pan's opposition, state: "update commission rate to 11.7% for sale of pool tickets [through] PPBL website." (Dkt. No. 19, Ex. 4.) Moreover, a typed copy of those notes, which has a handwritten notation at the top stating "Sent to Peter, Brian & Ted—for file," also includes the same language. (Dkt. No. 19, Ex. 5.) "Greyhound began paying the commission to Peter Pan for web sales as soon as Peter Pan began

---

[4] The court will refer to this agreement as the "2008 Agreement."

selling Pool tickets on its website on September 11, 2008 and paid a commission for all such sales until Greyhound unilaterally stopped in 2013." (Compl. ¶ 31.)

In May of 2011, the parties entered into another agreement: a Memorandum of Understanding ("MOU"). (*Id.* ¶ 48.) "The MOU was designed to resolve several outstanding issues between the parties relating to the operation of the Pool and the implementation of Express service on Pooled routes, including the implementation and use of capacity management within the pool." (*Id.*) Instead of using the traditional first-come, first-served basis for selling bus seats, Greyhound's Express service allowed customers to reserve seats. (*Id.* ¶¶ 49-51.) This "capacity management system" required tracking in real-time all the tickets sold by Greyhound and Peter Pan, so Greyhound would know exactly which seats had been sold at any given moment. (*Id.* ¶ 56.) "Unfortunately, due to limitations with Greyhound's software system (TRIPS), it was unable to communicate with Peter Pan's website and ticketing software." (*Id.* ¶ 57.) Greyhound therefore requested that Peter Pan convert its website to operate on the Greyhound software system. (*Id.*) In the interim, Greyhound proposed that Peter Pan's customers be redirected to Greyhound's website for purchase of pooled tickets. (*Id.*) Peter Pan, however, was concerned that redirecting its customers to Greyhound's website would deprive Peter Pan of its web sales commissions. (*Id.* ¶ 59.) Greyhound also claimed it could not track the sales that would have been made on Peter Pan's website. (*Id.*) The parties thus agreed that Greyhound would pay Peter Pan a commission on web sales at a fixed rate of 12.7948% based on the assumption that the division of web sales would remain the same as it had in the previous six months. (*Id.* ¶ 60.) Essentially, the parties were estimating, for purposes of allocating commissions, the web sales that would have occurred through Peter Pan's website until the software allowed the commissions to be based on the *actual* sales. (*Id.* ¶ 61.) The MOU provided that Greyhound would pay web commissions to Peter Pan at the 12.7948% rate "for up to a year, or until Greyhound provides Peter Pan with the capability to do so on their

website, whichever is sooner." (Dkt. No. 13, Ex. 5 ¶ 3.) The MOU also stated: "This MOU shall be governed by and construed in accordance with the laws of the State of Texas." (*Id.* ¶ 12.) "Greyhound began making web commission payments *under the MOU* to Peter Pan in June 2011 and continued to make payment of the web commissions until February 2013." (Compl. ¶ 62 (emphasis added).)

The parties experienced significant technical difficulties in trying to integrate their computer systems. (*Id.* ¶ 86.) On April 3, 2012, the parties executed a Web Services Agreement ("WSA") that "provided more detail regarding the services to be provided by Greyhound and the commissions to be paid to Peter Pan." (*Id.* ¶ 87.) The WSA "provided that, once Peter Pan was able to sell tickets through TRIPS via Greyhound's software, Greyhound would pay Peter Pan a commission on the resulting web sales, less expenses owed by Peter Pan to Greyhound." (*Id.* ¶ 88.) The commission rate set out in the WSA "was approximately 12.7%—exactly the same as the existing IVSE rate at the time the [WSA] was negotiated." (*Id.* ¶ 89.) The WSA provided that "the commissions . . . shall be applicable only for the first six months of the Initial Term of the Agreement commencing on the Effective Date. The Parties agree to negotiate in good faith the commissions to be paid by [Peter Pan] for the remainder of the Initial Term.'" (Dkt. No. 13, Ex. 6 ¶ 6.) The WSA also stated:

> This Agreement and the exhibits annexed hereto together constitute the entire agreement and understanding of the Parties concerning the GLI Web Services and supersede all prior or contemporaneous proposals or agreements, oral or written, and all other prior or contemporaneous communications between the Parties regarding the subject matter of this Agreement. This Agreement may only be amended or modified in writing signed by both Parties.

(*Id.* ¶ 10.8.) In addition, the WSA stated: "This Agreement will be governed by the laws of the State of Texas without regard to conflict of laws principles or any other principles that would result in the application of a different body of law and all disputes regarding the Agreement shall be brought in Dallas County, Texas." (*Id.* ¶ 10.4.)

The parties attempted to launch (or, more accurately, launched and took down) the new Peter Pan web site (with the Greyhound-compatible software) on a number of occasions from June of 2012 through March of 2013. (Compl. ¶¶ 91-95.) In light of this difficulty, Peter Pan began investigating the possibility of switching to a third-party vendor for processing web sales. (*Id.* ¶ 97.) Greyhound, however, gave a presentation in April of 2013 in which it stated that Peter Pan would still receive a web commission if it continued to operate under the WSA, but it would not receive a commission for web sales if it switched to the third-party vendor. (*Id.* ¶ 101.) "Based on this information, and the ongoing promise of web commissions, Peter Pan elected not to leave Web Services for [the third-party vendor] following the April 2013 meeting." (*Id.* ¶ 102.)

In February of 2013, however, Greyhound "unilaterally stopped paying web commissions to Peter Pan *under the Web Services Agreement.*" (*Id.* ¶ 103 (emphasis added).) This discontinuation of web commissions "only became known to Peter Pan when the February Pool settlement statements were produced by Greyhound after the April 2013 meeting." (*Id.*) Thereafter, Greyhound "further refused to negotiate in good faith regarding a web commission rate going forward, as required by the parties' agreement." (*Id.* ¶ 104.) On June 18, 2014, "the parties agreed to terminate the [WSA], reserving their respective rights to pursue claims thereunder." (*Id.* ¶ 106.)

## III. STANDARD OF REVIEW

When confronted with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept the well-pleaded allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). A complaint that states a plausible claim for relief, on its face, will survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has explained that "[a] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## IV. Discussion

Among other claims, Peter Pan asserts that it is entitled to commissions for Pool tickets sold on its website. Greyhound seeks dismissal of these web commission claims by arguing the 2008 Agreement, insofar as it relates to web commissions, cannot be enforced. It advances three separate theories in support of this argument. First, Greyhound argues that the 2008 Agreement between Peter Picknelly and Dave Leach is unenforceable under the statute of frauds. Second, Greyhound contends that because the 2008 Agreement did not have a specified duration, it was terminable at will. Third, Greyhound argues the WSA, which explicitly limited the duration of web commissions to six months, superseded the 2008 Agreement. The court agrees with Greyhound's last point and therefore will not address its first two theories. Nevertheless, as discussed below, the court concludes Peter Pan has plausibly alleged a promissory estoppel claim which is not grounded in the 2008 Agreement but, instead, is based on the April of 2013 presentation by Greyhound.

Because the WSA contains a choice-of-law provision stating that Texas law governs, the court looks to Texas substantive law in determining whether the WSA superseded the 2008 Agreement, as Texas law on this issue is not contrary to Massachusetts public policy.[5] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal courts sitting in diversity apply conflict of law rules of the forum state); *Feeney v. Dell Inc.*, 908 N.E.2d 753, 766 (Mass. 2009) ("Where parties

---

[5] In addition, the three RPAs and the MOU also contain Texas choice-of-law provisions. Moreover, as will be discussed, Peter Pan itself has alleged that the web commissions were paid "under" the WSA, thereby signifying that the WSA was the operative contract regarding the web commission issue, not the 2008 Agreement. *See Vision Graphics, Inc. v. E.I. Du Pont de Nemours & Co.*, 41 F. Supp. 2d 93, 97 (D. Mass. 1999). In any event, even if Massachusetts law applied, the court concludes the result would be the same, as Massachusetts and Texas law on this issue are consistent. *See, e.g., R & R Chems., LLC v. Cellect, LLC*, 2002 WL 2018725, at *4 (D. Mass. Aug. 29, 2002) (applying Massachusetts law to determine whether oral agreement was superseded by subsequent written contract).

have specifically expressed an intent as to the governing law, we respect that intent unless the result

would be contrary to our public policy.").

Under Texas law, two overlapping doctrines foreclose enforcement of the 2008 Agreement,

at least with regard to web commissions. First, the parol evidence rule[6] provides:

> When parties reduce an agreement to writing, the law of parol evidence presumes, in
> the absence of fraud, accident, or mistake, that any prior or contemporaneous oral or
> written agreements merged into the written agreement and, therefore, that any
> provisions not set out in the writing were either abandoned before execution of the
> agreement or, alternatively, were never made and are thus excluded from consideration
> in interpreting the written agreement.

*DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App. 2008). Second, "the

'merger doctrine,' an analogue to the parol-evidence rule, refers to the absorption of one contract

into another subsequent contract." *Texas A & M Univ.-Kingsville v. Lawson*, 127 S.W.3d 866, 872

(Tex. App. 2004). "Merger occurs when the same parties to an earlier agreement later enter into a

written integrated agreement covering the same subject matter." *Id.* "Absent pleading and proof of

ambiguity, fraud, or accident, a written instrument presumes that all the parties' earlier agreements

relating to the transaction have merged into the written instrument." *Id.*[7] The presumption of

merger is even more appropriate when the subsequent written contract contains an explicit merger

or integration clause. *See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co., Inc.*, 234 S.W.3d 711, 719

(Tex. App. 2007); *Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346, 1351 (5th Cir. 1971).

Here, the WSA addressed in part the same subject matter as the 2008 Agreement: payment

of web commissions. Peter Pan has alleged as much in its complaint: "the parties executed a Web

Services Agreement that provided more detail regarding the services to be provided by Greyhound

---

[6] Despite its name, "the parol evidence rule is a rule of substantive law," *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App. 2008), and thus must be applied in a diversity case "as a Texas court would," *Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990); *see also Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346, 1349 (5th Cir. 1971).

[7] Peter Pan has not argued or alleged in its complaint that it entered into the WSA based on fraud, accident, or mistake, or that the WSA is ambiguous. *See Wilkins v. Bain*, 615 S.W.2d 314, 315 (Tex. Civ. App. 1981).

*and the commissions to be paid to Peter Pan.*" (Compl. ¶ 87 (emphasis added).) Moreover, the WSA included a merger clause stating that the WSA and its exhibits "constitute the entire agreement and understanding of the Parties concerning the GLI Web Services and supersede all prior or contemporaneous proposals or agreements, oral or written, and all other prior or contemporaneous communications between the Parties regarding the subject matter of this Agreement." (Dkt. No. 13, Ex. 6 ¶ 10.8.) Granted, as Peter Pan argued at the hearing, the WSA mainly concerned technical issues regarding Peter Pan's access to Greyhound's ticket reservation software through its website. (*See id.* ¶ 1.) And the reference to "the entire agreement . . . concerning GLI Web Services" in the merger clause is fairly narrow, insofar as "GLI Web Services" is defined as Greyhound's method for accessing its reservation software. (*See id.* ¶¶ 1, 10.8.) But the merger clause does not end there; rather, it goes on to state that the WSA "supersede[s] all prior . . . agreements, oral or written, . . . between the Parties *regarding the subject matter of this Agreement.*" (*Id.* ¶ 10.8 (emphasis added).) Clearly, one of the subjects of the WSA was web commissions, which the WSA stated were "applicable only for the first six months of the Initial Term" of the WSA. (*See id.* ¶ 6.) The plain language of the WSA therefore demonstrates that it superseded the 2008 Agreement with regard to the duration of web commissions.

It is significant that Peter Pan alleged in its complaint that the web commissions were paid by Greyhound "under" the WSA until Greyhound unilaterally stopped in February of 2013. (Compl. ¶ 103.)[8] Peter Pan's own complaint recognizes the 2008 Agreement was superseded by the WSA. Peter Pan does not allege in its complaint, for example, that by February of 2013 the web commissions were paid in whole or in part pursuant to the 2008 Agreement. But then, in opposing Greyhound's motion to dismiss at the hearing, Peter Pan inconsistently asserted the 2008 Agreement

---

[8] Peter Pan also alleged in its complaint that, starting in June of 2011, "Greyhound began making web commission payments *under the MOU.*" (Compl. ¶ 62 (emphasis added).)

remained in effect for the remainder of the RPAs. It is well established that the allegations contained in the complaint control over inconsistent assertions made in briefs or arguments in opposition to a motion to dismiss. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir. 1996); *Luthy v. Proulx*, 464 F. Supp. 2d 69, 74 & n.25 (D. Mass. 2006) (citing *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 WL 532193, at *1 (D.N.H. Mar. 16, 2004).

The court also notes, although the parties have not explicitly raised this point, that there is an exception to the parol evidence and merger doctrines for collateral agreements that are consistent with the written contact. *See Gary E. Patterson & Assocs., P.C. v. Holub*, 264 S.W.3d 180, 197 (Tex. App. 2008). Texas courts have described such an agreement "as 'one that the parties might naturally make separately, *i.e.*, one not ordinarily expected to be embodied in, or integrated with, the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it.'" *ISG State Operations, Inc.*, 234 S.W.3d at 720 (quoting *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 179 n.10 (Tex. App. 2006))). "But this . . . exception does not permit parol evidence that varies or contradicts either the express terms or the implied terms of the written agreement." *DeClaire*, 260 S.W.3d at 45. Here, the court concludes, the 2008 Agreement and the WSA are inconsistent, and therefore the collateral agreement exception does not apply. Under the 2008 Agreement (according to Peter Pan) the web commissions were to last for the life of the pool, whereas the WSA states that the commissions were only to last for six months. Enforcement of the 2008 Agreement would vary or contradict the express terms of the WSA. Given the express terms in the WSA, including the merger clause, the court cannot conclude the parties would naturally expect the web commissions to be governed by a separate oral agreement made five years earlier. *See Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 176 (5th Cir. 1990) ("This court recognizes that even the most sophisticated businessmen often deal with each other informally and verbally, but in circumstances

such as these, even an unsophisticated businessman (which Brown was not) would either have

protested the unconditional release language or insisted on getting the alleged oral agreement in

writing."). It would be expected that any ongoing obligation to pay web commissions beyond six

months would be explicitly set forth in the WSA, or at the very least that the WSA would refer to

the 2008 Agreement if the latter were intended to still apply. *See id.* at 175 ("If it wanted to

incorporate some reference to the alleged oral promise, Signgraphics could simply have made its

acceptance 'subject to our understanding on future business.'"); *Davis v. Norris*, 352 S.W.3d 715, 719

(Tex. App. 2011) ("In this case, there is no evidence the contracts were intended to be interpreted

together, forming a single agreement. Neither contract in this case makes any reference to the other

contract.").[9]

Peter Pan also argued for the first time at the hearing that Greyhound cannot rely on the

WSA to assert it fulfilled its web commission obligations because Greyhound otherwise breached

the WSA by failing to timely deliver the compatible website interface. This argument was neither

raised in Peter Pan's briefing nor sufficiently developed at the hearing. Accordingly, the court will

not consider it. *See United States ex rel. Dyer v. Raytheon Co.*, 2013 WL 5348571, at *25 (D. Mass. Sept.

23, 2013) ("[E]xcept in extraordinary circumstances, arguments not raised in a party's initial brief

and instead raised for the first time at oral argument are considered waived." (quoting *United States v.*

*Giggey*, 551 F.3d 27, 36-37 (1st Cir. 2008))); *see also McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 22

n.7 (1st Cir. 1991) ("Courts are entitled to expect represented parties to incorporate all relevant

arguments in the papers that directly address a pending motion."); *United States v. Zannino*, 895 F.2d

1, 17 (1st Cir. 1990) ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly,'

---

[9] The court recognizes that the WSA contained a provision requiring the parties to negotiate in good faith regarding web commissions after the initial six-month period, but Peter Pan does not appear to be relying on this provision in asserting its web commission claims. Moreover, as Greyhound points out, "under Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a 'good faith effort' in the negotiations." *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 21 (Tex. App. 2000).

or else forever hold its peace." (quoting *Rivera-Gomez, v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)));
*Solmetex, LCC v. Apavia LLC*, --- F. Supp. 3d ----, 2016 WL 755613, at *2 n.2 (D. Mass. Feb. 25,
2016) (refusing to consider argument raised for the first time at oral argument); *Merzigian v. Sunbury
Transp., Ltd.*, 523 F. Supp. 2d 116, 122 n.3 (D. Mass. 2007) (same).

Accordingly, the WSA superseded the 2008 Agreement as a matter of law on the issue of
web commissions. Peter Pan's web commission claims predicated on the 2008 Agreement therefore
fail. This includes any promissory estoppel claim which arises out of the April of 2008 meeting
between Peter Picknelly and Dave Leach. *See Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App. 2007);
*Highlands Mgmt. Co., Inc. v. First Interstate Bank of Texas, N.A.*, 956 S.W.2d 749, 757 (Tex. App. 1997);
*Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 531 n.33 (Mass. App. Ct.
2007); *Vision Graphics, Inc. v. E.I. Du Pont de Nemours & Co.*, 41 F. Supp. 2d 93, 100 (D. Mass. 1999)
(citing *Coll v. PB Diagnostic Sys, Inc.*, 50 F.3d 1115-1124-25 (1st Cir. 1995)).

However, the court construes Peter Pan's complaint as asserting an additional promissory
estoppel claim based on the presentation given by Greyhound in April of 2013. This claim, in the
court's view, stands on different footing. Although prompted by the court, neither party developed
this issue at the hearing (or in their briefing). Nevertheless, the court concludes such a claim is
viable, at least at this stage of the litigation, under Massachusetts or Texas law. The presentation,
during which Greyhound promised it would continue to pay web commissions if Peter Pan did not
switch to a third-party vendor, occurred approximately one year after the parties entered into the
WSA. Accordingly, it is plausible to infer that this promise was not governed by, and it certainly was
not superseded by, the WSA. *See, e.g., El Paso Healthcare Sys., Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695,
699 (Tex. App. 1997). Rather, under the facts alleged in the complaint, the presentation constituted a
separate promise made *after* Greyhound already "stopped paying web commissions under" the WSA,

which Peter Pan relied on to its detriment. (Compl. ¶¶ 102-03.) Therefore, the court will not dismiss this claim.

## V.  CONCLUSION

In relation to Greyhound's partial motion to dismiss regarding web commission claims, the parties focused their attention on the enforceability of the 2008 Agreement. As explained, the court agrees with Greyhound that the WSA superseded the 2008 Agreement on the subject of web commissions. Accordingly, the court ALLOWS Greyhound's Motion to Dismiss (Dkt. No. 12) to the extent it seeks dismissal of the web commission claims in Counts I, II, and III which are predicated on the 2008 Agreement. The court, however, DENIES Greyhound's motion as to Peter Pan's promissory estoppel claim in Count II which is based on the presentation given by Greyhound in April of 2013.

It is So Ordered.


  _/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge